## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DARRELL L. STALLINGS,               )
                                    )
                    Plaintiff,      )
                                    )          **CIVIL ACTION**
v.                                  )
                                    )          **No. 10-3119-KHV**
ROGER WERHOLTZ, et al.,             )
                                    )
                    Defendants.     )
_____ )

## MEMORANDUM AND ORDER

Under 42 U.S.C. § 1983, pro se plaintiff Darrell L. Stallings brings suit against Roger Werholtz, Secretary of the Kansas Department of Corrections ("KDOC"), and numerous officials and staff of the El Dorado Correctional Facility ("EDCF") and Lansing Correctional Facility ("LCF").[1]  Plaintiff alleges that defendants violated his due process rights under the Fourteenth Amendment by placing and retaining him in administrative segregation without meaningful review and failing to respond to his grievances.  This matter comes before the Court on defendants' Motion For Summary Judgment (Doc. #56) filed June 27, 2011 and plaintiff's Motion In Opposition To Defendants' Motion For Summary Judgment And Cross Motion For Summary Judgment (Doc. #59) filed July 15, 2011.  For reasons stated below, the Court finds that defendants' motion should be sustained.

_____

[1]       Plaintiff asserts that defendants Marcelle Cappel-Schmidling, Stuart A. Bailey, Colette Winklebauer, Duane Muckenthaler, Janet Myers and Ron Baker placed him in administrative segregation for an indefinite period of time without providing him a meaningful opportunity to respond.  Plaintiff asserts that defendants Elizabeth Rice, Larry Hoshaw, David R. McKune, Ray Roberts, Charles Simmons, David Riggin, Denison Coellner, Maureen Malott, Jeff Quidachay, Brandon Walmsley and James Heimgartner failed to take corrective measures regarding his placement and retention in administrative segregation.

## **Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving parties are entitled to a judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>accord</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  <u>Anderson</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  <u>Id.</u> at 252.

The moving parties bear the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving parties meet their burden, the nonmoving party must demonstrate that genuine issues remain for trial "as to those dispositive matters for which [he] carries the burden of proof."  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on his pleadings but must set forth specific facts.  <u>Applied Genetics</u>, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment.  <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Anderson</u>, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on

suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).

In pro se prisoner litigation, the Tenth Circuit endorses the completion and filing of a "Martinez report" where the prison constructs an administrative record which details the factual investigation of the events at issue. See Martinez v. Aaron, 570 F.2d 317, 319 (10th Cir. 1978). The Court treats the Martinez report like an affidavit; the Court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence. Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997). The Court also treats a pro se prisoner's complaint, when sworn and made under penalty of perjury, as an affidavit; like the Martinez report, it serves as evidence for a summary judgment determination. See id.

Plaintiff's statements of fact do not include record citations for each numbered paragraph. The Court recognizes that pro se litigants should not succumb to summary judgment merely because they fail to comply with the technical requirements involved in defending a motion for summary judgment. See Woods v. Roberts, No. 94-3159, 1995 WL 65457, at *2 (10th Cir. Feb. 17, 1995); Hass v. U.S. Air Force, 848 F. Supp. 926, 929 (D. Kan. 1994). The Court has therefore searched the record to determine whether genuine issues of material fact preclude the entry of summary judgment for defendants.

## **Background**

The following material facts are uncontroverted or where controverted are stated in the light most favorable to plaintiff.

On February 1, 2005, plaintiff entered EDCF. On March 31, 2005, KDOC transferred plaintiff to LCF. On August 7, 2008, KDOC transferred plaintiff back to EDCF, where he is

currently incarcerated.

From February of 2005 to June of 2011, KDOC officials included Secretary Roger Werholtz, Deputy Secretary Charles Simmons, Corrections Classification Manager David Riggin and Risk Manager Elizabeth Rice. LCF officials and staff included Warden David McKune, Deputy Warden Colette Winklebauer, Major Ron Baker, Unit Team Manager Duane Muckenthaler and Lieutenants Marcelle Cappel-Schmidling, Stuart Bailey and Janet Myers. EDCF officials included Wardens James Heimgartner and Ray Roberts, Deputy Warden Denison Coellner, Segregation Lieutenant Jess Quidachay and Supermax Unit Team Managers Larry Hoshaw, Maureen Malott and Brandon Walmsley.

Placement in Administrative Segregation

On February 27, 2008, LCF prison staff found plaintiff in his cell with suspicious injuries. After a pre-segregation hearing, prison officials placed plaintiff in administrative segregation pending an investigation.[2] See Martinez Report (Doc. #50) at 2-3. On February 29, 2008, the Administrative Segregation Review Board held an initial segregation review and stated that the "[i]nmate was placed in segregation pending investigation of his housing needs. Hold pending investigation." Doc. #50-3.

On March 5, 2008, Investigator Tim Robinson interviewed plaintiff about his injuries and

---

[2]    Previously, on June 8, 2006, LCF officials had placed plaintiff in administrative segregation pending an investigation. On June 13, 2006, Investigator Charles Nance issued an Interdepartmental Memorandum which stated that plaintiff was a subject of an investigation of his involvement in illegal activity. Doc. #50-6. Nance stated that releasing plaintiff into general population could jeopardize the investigation and/or place the security of the facility at risk. On July 27, 2006, the Administrative Segregation Review Board agreed to release plaintiff back into General Population. Doc. #57-3.

the incident on February 27. Plaintiff told Robinson that other inmates had attacked and injured him but refused to say how many attackers were involved. On March 6, 2008, Robinson wrote an investigation report which stated that on February 27, shakedown officers had found a torn, bloody sweatshirt belonging to plaintiff on the floor of the cell house. Doc. #50-8. The shakedown officers then located plaintiff and found that he had injuries on his face and head, consistent with having been in a physical altercation.

After the incident on February 27, 2008, prison officials received numerous letters stating that plaintiff would be killed if he returned to general population. Robinson concluded that plaintiff should remain on segregation status until staff determined his housing needs. Plaintiff received monthly segregation reviews on March 21, April 10, May 22 and June 19, 2008.[3] See Doc. #50-4.

On June 26, 2008, Marcelle Cappel-Schmidling filed KDOC Administrative Segregation Report No. 1223, which stated as follows:

> On February 27, 2008, Tower-9 officer witnessed I/M's Darrell and Anthony Stallings # 48151 run into B-1 cellhouse carrying weapons. When staff searched D. Stallings, he had numerous serious injuries. C.I. [confidential informant] information indicated that earlier that day D. Stallings had been battered and held over the railing in the cellhouse. The assailant's intent was to cause great bodily harm or death to D. Stallings. Since the incident, Warden McKune, the Secretary of Corrections, unit team and the I&I Department have received numerous letters stating that Darrell Stallings and Anthony Stallings continue to threaten inmates from segregation and they will be killed if they return to population. Previously reliable informants confirmed the threat to their safety. Contraband and debt appear to be the reason for the attack and the threats made toward the Stallings brothers. During his interview, Inmate Darrell Stallings said that he is not a punk and would not be treated like one. His criminal history shows a propensity for retaliatory violence when he or his family are attacked or threatened. Considering the location and type of wounds Darrell Stallings received, it is obvious that he was in serious danger. Combined with his statement and the fact that their attempt at retaliation was

---

[3]    Plaintiff correctly notes that the <u>Martinez Report</u> suggested that in June of 2008, officials issued a segregation extension letter, but the cited letter is actually dated June 13, *2006*.

> thwarted by the observation of COI Watts; it does not seem likely that the problems have been resolved. If we release either of the Stallings brothers to general population they will become victims of additional violence or they will take retaliatory actions that will lead to violence. Therefore, it is recommended that their status be changed to Other Security Risk and they be moved to EDCF lockdown."

Doc. #50-7.[4]

On August 7, 2008, KDOC transferred plaintiff to EDCF and placed him in administrative segregation. During his entire confinement in administrative segregation at EDCF, plaintiff received monthly administrative segregation reviews, although he declined to participate in the review on several occasions. See Doc. ##50-13, 50-14, 50-15, 50-16.[5] On December 5, 2010, the EDCF staff recommended that plaintiff participate in the Behavior Management Program ("BMP") which is designed to help inmates successfully move from long-term administrative segregation to the general

---

[4]       In his verified complaint, plaintiff asserts that in 2006, during reviews of his previous placement in administrative segregation, defendant Cappel-Schmidling had threatened to put plaintiff in segregation "so long that he would think he was on death row." Doc. #1 at 27. Plaintiff alleges that Cappel-Schmidling manipulated the situation in February of 2008 to secure plaintiff's placement in administrative segregation.

[5]       In his verified complaint, plaintiff alleges that defendants falsified reports related to his placement in administrative segregation. In particular, plaintiff focuses on Administrative Segregation Report #1223. He notes that Administrative Segregation Report #803, dated February 27, 2008, listed the reason for segregation as "Pending Investigation." Plaintiff points out that Report #1223, dated June 26, 2008, listed the reason for placement in segregation as "Other Security Risk." Plaintiff alleges that defendants produced Report #1223 to "illegally change" his segregation status, and cites numerous prison regulations which defendants allegedly violated. In essence, plaintiff disagrees with defendants' decision to place and keep him in administrative segregation. Plaintiff also points to an unnumbered Administrative Segregation Report, Doc. #1-1 at 13, which unit team counselor Simpson gave him on August 14, 2008 in response to his request for documents. Plaintiff points out that Doc. #1-1 contains the same factual narrative as Report #1223, but includes both a report date and placement date of February 27, 2008. Plaintiff asserts that Doc. #1-1 was an attempt by prison officials to "properly effectuate" his segregation placement. The Court notes, however, that the unnumbered report, Doc. #1-1, is not signed by any prison employee or official or by plaintiff. Although the Court does not speculate why the "report" was generated, it does not appear to have had any operational effect.

population. Plaintiff remained in administrative segregation until June 28, 2011. See Memorandum In Support Of Defendants' Motion For Summary Judgment (Doc. #57) filed July 27, 2011 ("[plaintiff] will be entering the Behavioral Management Program ("BMP") on June 28, 2011") (citing Doc. #50-17).

During nearly three years in EDCF administrative segregation – from August of 2008 until the end of June of 2011 – plaintiff remained in a seven-by-ten foot cell for at least 23 hours each day. Five days a week, plaintiff spent one hour outside (weather permitting) or inside in a recreation room. Guards strip-searched plaintiff every time he left or returned to his cell. Whenever plaintiff left his cell, prison guards restrained him with handcuffs and led him with a chain or leash. Other inmates in the segregation unit often kicked on metal doors and stopped up toilets to cause flooding. Plaintiff was only allowed to visit family or friends via video conferencing.

Grievances

On May 30, 2008, plaintiff filed with the Secretary of Corrections a grievance which alleged that gang members had injured him. See Doc. #50-18. The grievance also asserted that Unit Manager Muckenthaler had failed to process plaintiff's grievances about Muckenthaler and about plaintiff's placement in administrative segregation. The grievance also requested a transfer to the Missouri state prison system because of threats from gangs. On June 17, 2008, KDOC Risk Manager Elizabeth Rice responded to plaintiff's grievance and advised him to use the inmate grievance procedure. Id. On July 18, 2008, Rice directed LCF officials to investigate plaintiff's complaint regarding responses to his grievances. Doc. #50-19.

On August 29, 2008, plaintiff filed a grievance with the Secretary of Corrections alleging that unit team members had proven untrustworthy to deliver grievances and that staff members had

falsified official records.  Doc. #50-20.  On September 12, 2008, Charles Simmons, then KDOC Deputy Secretary, found that the evidence did not support plaintiff's allegations that staff members had falsified records.  Simmons directed plaintiff to submit his complaints through the normal grievance procedure at the facility.  On November 14, 2008, former Warden Ray Roberts replied to an inquiry by plaintiff, stating that plaintiff was appropriately assigned to segregation.  Doc. #50-23.

On April 30, 2010, plaintiff filed grievance No. CA00016842 at EDCF, which asserted that prison personnel had falsified reports and that his indefinite segregation violated prison regulations and Fourteenth Amendment due process rights.  The unit team, Warden Roberts and the Secretary of Corrections designee all responded to the grievance and plaintiff received copies of the responses.  KDOC officials did not take any action on grievance No. CA00016842.  See Doc. #50-24; Martinez Rep. at 1.

### Analysis

Plaintiff claims that defendants violated his Fourteenth Amendment due process rights by placing and retaining him in administrative segregation without meaningful review and failing to respond to his grievances.  Defendants assert that they are entitled to summary judgment because the Eleventh Amendment bars plaintiff's claims for damages against defendants in their official capacities.  As to the remaining claims, defendants seek summary judgment because (1) plaintiff has not established a protected liberty interest in avoiding extended confinement in administrative segregation; and (2) plaintiff has no constitutional right to a prison grievance process.

**I.      Official Capacity Claims For Damages – Eleventh Amendment Immunity**

Defendants assert that they are entitled to Eleventh Amendment immunity on plaintiff's

claims for damages against them in their official capacities.  The Eleventh Amendment doctrine of sovereign immunity bars actions for damages against a State, its agencies and its officials acting in official capacities, see Kentucky v. Graham, 473 U.S. 159, 165-169 (1985), including actions arising under Section 1983, see Klein v. Univ. of Kan. Med. Ctr., 975 F. Supp. 1408, 1415 (D. Kan. 1997). An action against a state official in his or her official capacity is not a suit against the official, but against the official's office, and accordingly is no different than a suit against the State itself.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  To the extent that plaintiff sues defendants in their official capacities, they are entitled to Eleventh Amendment immunity as to money damages under 42 U.S.C. § 1983.  Id.  Defendants are therefore entitled to summary judgment on plaintiff's claims for money damages against defendants in their official capacities.

**II.     Due Process/Liberty Interest – Placement And Continued Confinement in Administrative Segregation**

To make a claim of denial of due process in violation of the Fourteenth Amendment, plaintiff must show the deprivation of a protected liberty or property interest.  Schmitt v. Rice, 421 Fed. Appx 858, 861 (10th Cir. 2011) (citing Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 569 (1972)).  Lawfully incarcerated persons retain only a narrow range of protected liberty interests. Abbott v. McCotter, 13 F.3d 1439, 1442 (10th Cir. 1994).  The Due Process Clause itself "does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Toevs v. Reid, 646 F.3d 752, 756 (10th Cir. 2011) (quoting Wilkinson v. Austin, 545 U.S. 209, 221 (2005)); see Trujillo v. Williams, 465 F.3d 1210, 1225 (10th Cir. 2006) (ordinarily prisoner does not have liberty interest independently protected by Due Process Clause to be placed in general prison population, rather than in segregation).  In the prison context, state regulations can create protected liberty interests, but such interests are "generally limited to freedom from restraint which, while not

exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Toevs, 646 F.3d at 756 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995) (citations omitted)).

Here, plaintiff alleges that defendants placed and held him in administrative segregation for a lengthy period of time without meaningful periodic reviews. If true, he may have a liberty interest for atypical and significant restraint deserving due process protections. See Toevs, 646 F.3d at 756.

The Tenth Circuit has identified four factors which Courts should consider in the liberty-interest inquiry: "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . ; and (4) the placement is indeterminate." In re Estate of DiMarco v. Wy. Dep't of Corr., 473 F.3d 1334, 1342 (10th Cir. 2007). In making this assessment, the Court "must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts." Id.

Here, plaintiff has not controverted defendants' evidence that the decision to place and retain him in segregation related to and furthered a legitimate penological interest. Officials originally placed plaintiff in administrative segregation because other inmates attacked and injured him. Defendants thus had legitimate security interests to protect plaintiff and to reduce the risk to staff and other inmates. See Sandin 515 U.S. at 480 (courts must "afford appropriate deference and flexibility to [prison] officials trying to manage a volatile environment"). After the investigation, officials classified plaintiff as an "Other Security Risk" based on threats from other inmates as well as plaintiff's indication that he might engage in retaliatory violence.

-10-

As for the second factor, defendants merely state that "the conditions, while not comfortable, were not extreme." See Doc. #60 at 9; see also Doc. #57 at 10 ("conditions of plaintiff's confinement were not atypical of those faced by prisoners in protective custody"); Doc. #57 at 12 ("confinement in administrative segregation does not subject plaintiff to any atypical and significant hardship"). But plaintiff cites facts which reflect the severe nature of his confinement, including 23 hours per day in a small cell; only five hours of recreation time weekly; use of restraints for all transit outside his cell and no visits except by video. Cf. Wilkinson, 545 U.S. at 214–16, 223-24 (solitary confinement coupled with indefinite duration and loss of parole consideration combine to impose atypical and significant hardship, creating liberty interest).[6]

As for the third factor, plaintiff has not presented any evidence that his placement in administrative segregation led to loss of good time credit or otherwise increased the length of his

---

[6]     In Wilkinson, the Supreme Court described conditions at the Ohio State Penitentiary as follows:

> In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.

> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.

545 U.S. at 214.

confinement.  See Sandin, 515 U.S. at 487.

Finally, under the fourth factor, defendants have presented uncontroverted evidence that prison officials reviewed plaintiff's placement on a monthly basis.  Although plaintiff's verified complaint alleges that defendants falsified records of these monthly reviews and other documents, for the most part these allegations are conclusory or not supported by the record.

Based on all of the DiMarco factors, the Court finds that plaintiff's conditions of confinement, though certainly harsh, did not impose a significant hardship.  See Schmitt v. Rice, No. 08-3047-SAC, 2010 WL 3775526, at *4 (D. Kan., Sept. 21, 2010) (lack of exercise and exposure to noise and odors unpleasant but not atypical), aff'd, 421 Fed. Appx. 858 (10th Cir. 2011); Cf. Toev, 646 F.3d at 757 (indefinite placement that lasted for years, in harsh conditions, set out protected liberty interest); Fogle v. Pierson, 435 F.3d 1252, 1259 (10th Cir. 2006) (three-year period of administrative segregation – during which plaintiff confined to cell for all but five hours each week and denied access to any outdoor recreation – arguably "atypical"); see also Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000) (eight years in administrative custody, with no prospect of immediate release in near future, "atypical" in relation to ordinary incidents of prison life); McClary v. Coughlin, 87 F. Supp.2d 205, 208 n. 2, 209 (W.D.N.Y. 2000) (four-year placement in administrative segregation, with sham review and same harsh conditions as punitive segregation, created liberty interest).  Defendants are therefore entitled to summary judgment on plaintiff's claim that their actions in confining him to administrative segregation violated his liberty interests.

### III.     Due Process/Liberty Interest – Grievance Procedure

A prisoner does not have a protected right to have a grievance investigated; therefore, neither the denial of a grievance nor the failure to investigate a grievance gives rise to a constitutional claim. See Larson v. Meek, 240 Fed. Appx. 777, 780 (10th Cir. 2007) (defendant's denial of grievances insufficient to establish personal participation in alleged constitutional violations); Walters v. Corr. Corp. of Am., 119 Fed. Appx. 190, 191 (10th Cir. 2004) (when claim underlying administrative grievance involves constitutional right, prisoner's right to petition government for redress is right of access to courts, which is not compromised by prison's refusal to entertain grievance); Sims v. Miller, 5 Fed. Appx. 825, 828 (10th Cir. 2001) (plaintiff's contention that prison officials failed to comply with grievance procedures did not allege violation of federal constitutional right); see also Bingham v. Thomas, ___ F.3d ___, 2011 WL 3862101, at * 4 (11th Cir. Sept. 2, 2011) (inmates have no constitutional liberty interest in access to prison grievance procedure).  Defendants are therefore entitled to summary judgment on plaintiff's claim that they failed to adequately process or investigate his grievances.

**IT IS THEREFORE ORDERED** that defendants' Motion For Summary Judgment (Doc. #56) filed June 27, 2011 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that plaintiff's Motion In Opposition To Defendants' Motion For Summary Judgment And Cross Motion For Summary Judgment (Doc. #59) filed July 15, 2011 be and hereby is **OVERRULED AS MOOT**.

Dated this 30th day of December, 2011 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge